## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OKLAHOMA

UNITED STATES OF AMERICA,

    Plaintiff,

v.

EDER OMAR ZAMORA-
HERNANDEZ,

    Defendant.

Case No. 24-CR-00297-SEH

### OPINION AND ORDER

Before the Court is Defendant Eder Omar Zamora-Hernandez's motion to dismiss the indictment [ECF No. 29]. Defendant is charged with being an alien unlawfully in the United States in possession of a firearm, in violation of 18 U.S.C. §§ 922(g)(5)(A) and 924(a)(8). [ECF No. 12]. He argues that § 922(g)(5)(A) is unconstitutional on its face and as applied to him, in light of the Supreme Court's decision in *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1 (2022). [ECF No. 29]. For the reasons provided below, the motion is denied.

### I. Background/Procedural History

A federal grand jury charged Zamora-Hernandez with knowingly possessing, in and affecting interstate and foreign commerce, a Glock Model 17, 9mm caliber semi-automatic pistol and 22 rounds of various ammunition

while he was an alien illegally and unlawfully in the United States. [ECF No. 12]. He now moves to dismiss the indictment, arguing that the statute he is charged with violating, § 922(g)(5)(A), is unconstitutional on its face and as applied to him.[1] [ECF Nos. 29, 33]. He argues that "[p]rohibiting and criminalizing the possession of firearms and ammunition solely because an individual is an alien unlawfully present in the United States has no basis in the history of the Second Amendment." [ECF No. 29 at 3].

The government responds that Zamora-Hernandez's claim fails under both steps of the *Bruen* analysis. [ECF No. 30]. Specifically, the government argues that Zamora-Hernadez's conduct is not protected by the Second Amendment and the restriction in § 922(g)(5)(A) is consistent with the Nation's historical tradition of firearm regulation. [*Id.* at 6].

Zamora-Hernandez replies that he is part of "the people" to whom Second Amendment protection applies. [ECF No. 33 at 1–2]. He further argues that the analogy the government seeks to draw between prohibiting firearm

---

[1] Zamora-Hernandez raised his as-applied challenge for the first time in his reply brief. [ECF No. 33 at 1]. Thus, I could decline to consider it. *See United States v. Leffler*, 942 F.3d 1192, 1197–98 (10th Cir. 2019) (declining to consider arguments made for the first time in a reply because doing so protects the court "from issuing 'an improvident or ill-advised opinion' because [it] did not have the benefit of the adversarial process."); *see also United States v. Harrell*, 642 F.3d 907, 918 (10th Cir. 2011) ("[A]rguments raised for the first time in a reply brief are generally deemed waived."). However, because the parties each proffered facts in their briefing related to Zamora-Hernandez's individual circumstances, I will address his as-applied challenge in this Opinion and Order.

possession by unlawfully present aliens and its tendered historical analogues "ignore[s] the data on the prevalence of criminal activity among unlawfully present aliens." [*Id.* at 3–4].

## II. Second Amendment Jurisprudence

In *District of Columbia v. Heller*, the Supreme Court held that the Second Amendment guarantees an individual right to possess firearms. 554 U.S. 570, 595 (2008). After *Heller*, most federal appellate courts applied a two-step framework using a means-end analysis to determine the constitutionality of § 922(g)'s restrictions on Second Amendment rights.

The Tenth Circuit employed this framework in *United States v. Huitron-Guizar*, 678 F.3d 1164 (10th Cir. 2012), in which the appellant argued that § 922(g)(5)(A) is an unconstitutional firearm restriction. The Circuit upheld § 922(g)(5)(A) as constitutional by applying "intermediate scrutiny" and finding that the law was "substantially related" to an "important" official end—primarily, "crime control and public safety." *Id.* at 1169–70.

In *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, the Supreme Court set out a new two-step test for determining whether legislation regulating the use or possession of firearms violates the Second Amendment. 597 U.S. 1 (2022). Under *Bruen*, a court considering such a challenge must first determine whether the Amendment's "plain text covers an individual's conduct." *Id.* at 17. If so, "the Constitution presumptively protects that

3

conduct" and "the government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id.* at 17, 24 ("To justify its regulation, the government may not simply posit that the regulation promotes an important interest.").

*Bruen* offered guidance for making the historical inquiry at the second step. "[W]hen a challenged regulation addresses a general societal problem that has persisted since the 18th century, the lack of a distinctly similar historical regulation addressing that problem is relevant evidence," although not necessarily dispositive, "that the challenged regulation is inconsistent with the Second Amendment." *Id.* at 26. Likewise, if "earlier generations addressed th[at same] societal problem, but did so through materially different means, that also could be evidence that a modern regulation is unconstitutional." *Id.* at 26–27. However, the historical inquiry is not a "regulatory straightjacket[.]" *Id.* at 30. It "requires only that the government identify a well-established and representative historical *analogue*, not a historical *twin*." *Id.* at 30 (emphasis in original).

In *United States v. Rahimi*, the Supreme Court provided additional insight into how courts should approach the historical analysis laid out in *Bruen*. 602 U.S. 680 (2024). Because the Second Amendment allows "more than just those regulations identical to ones that could be found in 1791," *id.* at 741 (Jackson, J., concurring), the Court directed that lower courts "must

ascertain whether the new law is relevantly similar to laws that our tradition is understood to permit, applying faithfully the balance struck by the founding generation to modern circumstances." *Id*. at 681 (cleaned up). Contemporary laws that address problems like those addressed by the restriction need not "precisely match its historical precursors" to "pass constitutional muster." *Id*. (quoting *Bruen*, 597 U.S. at 30). And although it "must comport with the principles underlying the Second Amendment," the contemporary restriction "need not be a dead ringer or a historical twin." *Id*. at 692 (cleaned up). Finally, when drawing analogies to historical regulations, courts should consider "[w]hy and how the regulation burdens the right" to bear arms. *Id*. at 681 (citing *Bruen*, 597 U.S. at 29).

## III. Analysis

### A. *Huitron-Guizar does not foreclose Zamora-Hernandez's challenge.*

As an initial matter, I must determine whether the Supreme Court's decision in *Bruen* constitutes an intervening decision that relieves this Court of its obligation to follow Tenth Circuit authority that otherwise binds district courts within this circuit. I find that *Bruen* is such a decision under the circumstances presented. *See United States v. Doe*, 865 F.3d 1295, 1298-99 (10th Cir. 2017) (circuit precedent is no longer binding "when the Supreme

Court issues an intervening decision that is contrary to or invalidates our previous analysis") (internal quotation marks omitted).

In *Bruen*, the Supreme Court rejected means-end scrutiny and abrogated decisions that employed it. *See Bruen*, 597 U.S. 1 at 19. The Tenth Circuit employed means-end scrutiny in *Huitron-Guizar*, as opposed to simply following dictum in *Heller* indicating that statutes like § 922(g) were unaffected by its holding. *Compare Huitron-Guizar*, 678 F.3d at 1169 (applying "intermediate" scrutiny to uphold § 922(g)(5)(A) as constitutional) *with United States v. McCane*, 573 F.3d 1037, 1047 (10th Cir. 2009) (relying on *Heller*'s explicit statement that nothing in the opinion "should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons.") (quoting *Heller*, 554 U.S. at 626)). Therefore, because *Huitron-Guizar* upheld § 922(g)(5)(A) as constitutional by using means-end scrutiny, *Bruen* constitutes an intervening decision that removes *Huitron-Guizar*'s binding authority on Zamora-Hernandez's Second Amendment challenge.

### B. Section 922(g)(5)(A) is constitutional under Bruen's framework.

Although *Bruen* changed the analytical framework, it has not undermined the constitutionality of federal firearms laws. And no circuit court has held § 922(g)(5)(A) "to be unconstitutional, either before or after *Bruen*." *United States v. Rangel-Tapia*, No. 23-1220, 2024 WL 966385, at *3 (6th Cir. Mar. 6, 2024) (citing *United States v. Sitladeen*, 64 F.4th 978, 983–84 (8th Cir. 2023)

(collecting cases and upholding the statute post-*Bruen*)). I reach the same conclusion here. That is, § 922(g)(5)(A) is a permissible firearms restriction on Second Amendment rights, as supported by this Nation's history and tradition.

> 1. *The Court assumes, without deciding, that the Second Amendment presumptively protects Zamora-Hernandez's conduct.*

The Second Amendment provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. CONST. amend. II. Under *Bruen*, I must first determine whether the Second Amendment's plain text covers Zamora-Hernandez's conduct. If so, "the Constitution presumptively protects [his] conduct." *Bruen*, 597 U.S. at 24.

The government asserts noncitizens unlawfully present in the United States are not among "the people" covered by the plain text of the Second Amendment, primarily because the Supreme Court has repeatedly referred to the Second Amendment right as one held by "citizens" who are "law-abiding." [ECF No. 30 at 8–15]. Zamora-Hernandez maintains he is a member of "the people" because the Supreme Court has explained that the term refers to a class of persons who have "developed sufficient connection with this country to be considered part of that community." [ECF No. 33 at 2] (quoting *Heller*,

554 U.S. at 580); (quoting *United States v. Verdugo-Urquidez*, 494 U.S. 259, 265 (1990)).

In *Heller*, the Court engaged in a textual analysis of the Second Amendment's language to determine that the Constitution protects the right of individuals to possess and carry weapons in case of confrontation. 554 U.S. at 592. That textual analysis was confirmed by "the historical background of the Second Amendment." *Id*. The government attempts to add a historical tradition burden into *Bruen*'s first step by discussing the purported historical tradition of regulating firearm use by various classes of people. [ECF No. 30 at 13–15]. "But *Bruen* makes clear that the first step is one based solely on the text of the Second Amendment to determine if it presumptively protects an individual's conduct—a presumption that the United States can *then* rebut with history and tradition." *United States v. Harrison*, No. CR-22-00328-PRW, 654 F. Supp. 3d 1191, 1198 (W.D. Okla. Feb. 3, 2023) (emphasis in original).

In *Huitron-Guizar*, the Tenth Circuit assumed, without deciding, that "at least some" unlawfully present aliens were part of "the people" covered by the text of the Second Amendment. *Huitron-Guizar*, 678 F.3d at 1169. Federal district courts across the country have rejected constitutional challenges to

§ 922(g)(5) by leaving the issue undecided and finding the statute

constitutional under the historical analysis step of the *Bruen* inquiry.[2]

Consistent with these decisions and based on the Tenth Circuit's

discussion in *Huitron-Guizar*, I find it unnecessary to decide whether

Zamora-Hernandez is part of "the people" entitled to Second Amendment

protection. The Tenth Circuit recognized the "large and complicated" nature

of this issue and the need for restraint, given the lack of clarity from the

Supreme Court. *Huitron-Guizar*, 678 F.3d at 1167–69. I decline to answer the

question the Circuit intentionally left open.

Therefore, I will assume, without deciding, that "the people" protected

under the Second Amendment's right to bear arms includes "at least some

aliens unlawfully here." *Huitron-Guizar*, 678 F.3d at 1167. Thus, the

government must "justify [§ 922(g)(5)(A)] by demonstrating that it is

---

[2] *See, e.g., United States v. Duque-Ramirez*, No. CR-24-13-SLP, 2024 WL 4508582, at *3–4 (W.D. Okla. Oct. 16, 2024); *United States v. Figueroa-Camarillo*, 730 F. Supp.3d 1137, 1140–41 (D.N.M. 2024); *United States v. Negrete*, No. 2:24-cr-00103-JAD-DJA-2, 2024 WL 4624849, at *2–5 (D. Nev. Oct. 30, 2024); *United States v. Leveille*, 659 F. Supp. 3d 1279, 1283–85 (D.N.M. 2023); *United States v. Gil-Solano*, 699 F. Supp. 3d 1063, 1068–69 (D. Nev. 2023); *United States v. Deborba*, 713 F. Supp. 3d 1042, 1051 (W.D. Wash. 2024); *United States v. Bernabe-Martinez*, No. 1:22-CR-00276-AKB-1, 2024 WL 778114, at *5 (D. Idaho Feb. 26, 2024); *United States v. De Los Santos-Santana*, Crim. No. 23-311 (GMM), 2024 WL 98556, at *3–5 (D.P.R. Jan. 8, 2024); *United States v. Escobar-Temal*, No. 3:22-CR-00393, 2023 WL 4112762, at *3–6 (M.D. Tenn. June 21, 2023); *United States v. Trinidad-Nova*, 671 F. Supp. 3d 118, 122–24 (D.P.R. 2023).

consistent with the Nation's historical tradition of firearm regulation." *Bruen*,
597 U.S. at 24.

> 2. *Section 922(g)(5)(A) is constitutional because it is consistent with the Nation's historical tradition of firearm regulation.*
>
> a. Section 922(g)(5)(A) is constitutional on its face.

Zamora-Hernandez contends there is no historical precedent for
criminalizing possession of firearms for undocumented immigrants because
§ 922 of the United States Code "was not enacted until 1968." [ECF No. 29 at
3]. I do not find this argument persuasive.

*Rahimi* explained that "the Second Amendment permits more than just
those regulations identical to ones that could be found in 1791." 602 U.S. at
691–92. The "appropriate analysis" does not require a consistent founding era
regulation; rather, it "involves considering whether the challenged regulation
is consistent with the principles that underpin our regulatory tradition." *Id.*
at 692. Thus, "[a] court must ascertain whether the new law is 'relevantly
similar' to laws that our tradition is understood to permit." *Id.*

Here, I find the government has met its burden of demonstrating that
§ 922(g)(5)(A) is "relevantly similar" to the Nation's tradition of firearm
regulation. It points to "several relevant examples of how legislatures
restricted firearm rights for groups deemed outside the political community"
—including Native Americans. [ECF No. 30 at 18–19] (citing *United States v.*

*Perez*, 6 F.4th 448, 462 n.4 (2d Cir. 2021) (Menashi, J., concurring)). During

the early colonial period, Indians were citizens of their own tribal nations and

not citizens of the colonies or subjects of the crown. The colonists and Indians

engaged in trade, but the two groups also became embroiled in disputes. *See*

COHEN'S HANDBOOK OF FEDERAL INDIAN LAW §2.02[2] (Neil Jessup Newton &

Kevin K. Washburn, eds., 2024). Ultimately, the colonists passed laws to

limit gun ownership among Indians. "The Massachusetts general laws of

1648, the Commonwealth's first legal code, made it a crime for anyone to

'directly or indirectly amend, repair … any gun, small or great, belonging to

any Indian … Nor shall he sell or give to any Indian, directly or indirectly,

any such gun, or any gun-powder … upon payn (sic) of ten pounds fine.'"

Joyce Lee Malcolm, *To Keep and Bear Arms* 140 (1994). Although this is no

twin to § 922(g)(5)(A), it is an example of an early principle underpinning our

nation's regulation of firearms. Tribal nations would later occupy a unique

place in the United States as 'domestic dependent' nations. *Cherokee Nation*

*v. State of Ga.*, 30 U.S. 1, 2, 8 L. Ed. 25 (1831). But before the American

Revolution, Indians were aliens when present in the colonies. COHENS

§ 2.05[1]. I find it revealing that colonists reacted to the perceived threat

these noncitizens posed by restricting access to firearms and ammunition.

The government also points to the founding-era prohibition of gun

possession by those deemed to be a threat to public safety, because of

dangerousness or a refusal to swear an oath of loyalty. [*Id*. at 19–20]. "In

England, officers of the Crown had the power to disarm anyone they judged

to be dangerous to the Peace of the Kingdom." *Kanter v. Barr*, 919 F.3d 437,

456 (7th Cir. 2019) (Barrett, J., dissenting) (citation and internal quotation

marks omitted); [ECF No. 30 at 19]. In Revolutionary America, people were

disarmed who "refused to swear their allegiance and fidelity" to the

revolutionary regime, "who defamed resolutions of the Continental

Congress," or "who were unwilling to abide by … legal norms." [ECF No. 30

at 19]; *Range v. Atty Gen.*, 69 F.4th 96, 125 (3rd Cr. 2023) (Krause, J.,

dissenting) (vacated and remanded for rehearing) (internal quotation marks

and citations omitted). During the Revolution, colonial governments

disarmed those who refused to "swear an oath of allegiance to the state or the

United States." [ECF No. 30 at 19]; *Bernabe-Martinez*, 2024 WL 778114, at

*5 (quoting Saul Cornell & Nathan DeDino, *A Well Regulated Right: The

Early American Origins of Gun Control*, 73 Fordham L. Rev. 487, 506 (2004)).

I find the government has provided historical evidence demonstrating that

§ 922(g)(5)(A) fits within the Nation's historical tradition. Although

regulations barring firearm possession based on a failure to take a loyalty

oath are not identical to the regulation in § 922(g)(5), the historical

regulation need not be a "historical twin" or a "dead ringer." *See Bruen*, 597

U.S. at 30. Indeed, "immigration laws are the 'imperfect system the United

States has set up as a proxy for national allegiance.'" *Gil-Solano*, 699 F.
Supp. 3d at 1072 (quoting *Leveille*, 659 F. Supp. 3d at 1284). "By refusing to
take an oath of allegiance to the state, those associated with foreign
governments renounced their membership in the American political
community and, in doing so, forfeited the state's protection of their right to
arms—even if they continued to live on American soil." *United States v.
Jimenez-Shilon*, 34 F.4th 1042, 1048 (11th Cir. 2022) (citing *Perez*, 6 F.4th at
462 (Menashi, J., concurring)). "These laws reveal 'an early feature of the
emerging republic'—the selective 'disarmament of groups associated with
foreign elements.'" *Id.* (citing Pratheepan Gulasekaram, *"The People" of the
Second Amendment: Citizenship and the Right to Bear Arms*, 85 N.Y.U. L.
Rev. 1521, 1548–49 (2010)). Therefore, I am convinced that a sufficient and
substantial historical tradition of prohibiting aliens unlawfully in the United
States from possessing firearms exists.

In his reply, Zamora-Hernandez claims that the "cited laws, statutes, and
state constitutional provisions were based on racial and religious
classifications that would not pass constitutional muster today." [ECF No. 33
at 3]. But this decision does not rest on historical traditions of excluding
politically disfavored groups. Rather, 922(g)(5)(A)'s constitutionality solidly
rests on the Nation's historical tradition of disarming people who did not
swear allegiance to a state or to the United States.

Zamora-Hernandez further cites *Untied States v. Benito*, 739 F. Supp.3d

486 (S.D. Miss. 2024) and claims the decision "addresses in detail the

fallacies underlying each of the arguments put forth by the Government."

[ECF No. 33 at 3]. I do not find this out-of-circuit district court decision

persuasive. Rather, I agree with the overwhelming weight of authority

finding § 922(g)(5)(A) consistent with the Second Amendment's historical

understanding based on the laws disarming those who had not sworn an oath

of allegiance.[3]

---

[3] *See, e.g., Negrete*, 2024 WL 4624849, at *4 (finding founding-era laws requiring
oaths of allegiance as a prerequisite to gun ownership a sufficiently relevant
historical analogue to § 922(g)(5)); *United States v. Vasquez-Ramirez*, 711 F. Supp.
3d 1249, 1259 (E.D. Wash. 2024) (same); *De Los Santos-Santana*, 2024 WL 98556,
at *4 (same); *Bernabe-Martinez*, 2024 WL 778114 at *6 (collecting multiple district
court cases and concluding "§ 922(g)(5)(A) tracks 'closely with the historical
restrictions on firearm access to individuals who did not swear an oath of
allegiance.'"); *United States v. Serrano-Restrepo*, No. 2:24-cr-107, 2024 WL 4852233,
at *8 (S.D. Ohio Nov. 21, 2024) (collecting cases and holding that "disarming
unlawful immigrants … who have not sworn allegiance to the United States
comports with the Nation's history and tradition of firearm regulations); *see also
Gil-Solano*, 699 F. Supp. 3d at 1069–72 * n.5 (listing states which had similar laws
disarming those who had not sworn an oath of allegiance, and finding those laws
relevantly similar to § 922(g)(5)); *United States v. Andrade-Hernandez*, No. 3:23-CR-
26-DCB-LGI, 2023 WL 4831408, at *6 (S.D. Miss. July 27, 2023) (reaching the same
conclusion as to loyalty oaths to the extent it was required to proceed to historical
analysis); *but see Deborba*, 713 F.Supp.3d at *1062 (concluding "there ran parallel a
separate tradition of disarming non-law-abiding persons" in the founding era which
more closely resembles § 922(g)(5) than "the tradition of disarming loyalists,
Catholics, Native Americans, and slaves" or oath-based disarmament).
The only cases I am aware of to find § 922(g)(5) facially unconstitutional is the
decision from the Southern District of Mississippi that Zamora-Hernandez cites,
*United States v. Benito*, 739 F.Supp.3d 486 (S.D. Miss. 2024), and a decision from
the District of Maine, *United States v. Rebollar Osorio*, No. 2:24-cr-00040-NT, 2024
WL 4476005, at *11 (D. Maine Oct. 11, 2024), which rejected the oath-based
analogies advanced by the government because it was not provided copies of the

Last, Zamora-Hernandez argues that the analogies provided by the government "ignore the data on the prevalence of criminal activity among unlawfully present aliens." [ECF No. 33 at 3]. In making this argument, he appears to acknowledge § 922(g)(5)(A) and historical allegiance laws are based on comparable justifications of potential danger to society. His argument, therefore, is less about a lack of a relevant historical comparison than a challenge to the underlying legislative justification behind § 922(g)(5)(A), which is what *Bruen* prohibited when it rejected means–end scrutiny.

Because the historical analogues presented by the government from before, during, and after the founding-era demonstrate a tradition of regulating a noncitizen's right to keep and bear arms that is sufficiently comparable to the restriction under § 922(g)(5)(A), I find the statute constitutional on its face.

   a.  Section 922(g)(5)(A) is constitutional as applied to Zamora-Hernandez.

Unlike a facial challenge, which requires the moving party to "establish that no set of circumstances exists under which the [statute] would be valid,"

---

relevant statutes to review. *Rebollar Osorio* further upheld the defendant's as-applied challenge by citing *Benito* and finding the government had not met its burden through its "loose analogies." 2024 WL 4476005, at *13. The only other case I am aware of that found § 922(g)(5) unconstitutional as applied to a defendant is a decision from the Northern District of Illinois, and that decision was highly specific to the facts of that case. *See United States v. Carbajal-Flores*, 720 F. Supp. 3d 595, 599–601 (N.D. Ill. 2024).

*United States v. Salerno*, 481 U.S. 739, 745 (1987), "an as-applied challenge

tests the application of that restriction to the facts of [the defendant's]

concrete case." *Harmon v. City of Norman*, 61 F.4th 779, 789 (10th Cir. 2023)

(quoting *iMatter Utah v. Njord*, 774 F.3d 1258, 1264 (10th Cir. 2014)).

Classifying a challenge as facial or as-applied "does not speak at all to the

substantive rule of law necessary to establish a constitutional violation[;]"

therefore, the same substantive constitutional analysis applies. *Bucklew v.

Precythe*, 587 U.S. 119, 138 (2019). Considering the full measure of disability

imposed on noncitizens by § 922(g)(5)(A), I must ask whether historical

analogues to contemporary laws exist that prohibit noncitizens like Zamora-

Hernandez from possessing firearms.

   Zamora-Hernandez states that "he entered the United States in 2008 at

the age of three and remained in the country until his arrest in July 2024."

[ECF No. 33 at 2]. The government provides that "the acts that brought

Zamora-Hernandez to the attention of police confirm he is not law abiding: he

was involved in a multi-city car theft operation and was in possession of a

firearm while engaging in that activity." [ECF No. 30 at 10]. Although the

parties provided this information to support their arguments about whether

Zamora-Hernandez is part of "the people" afforded Second Amendment

protection, I will consider it as information addressing his as-applied

challenge. However, I do not find Zamora-Hernandez's individual

circumstances relevant to resolving his constitutional claim.

Section 922(g)(5)(A) is a categorical, status-based ban that applies to any

noncitizen "illegally or unlawfully in the United States" without

individualized consideration of their circumstances. This is a significant

difference from laws like the subsection at issue in *Rahimi*, which applies

"[w]hen a restraining order contains a finding that an individual poses a

credible threat to the physical safety of an intimate partner." 602 U.S. 690–

91 (citing 18 U.S.C. § 922(g)(8)). Although considering individual

circumstances may be appropriate for a firearm ban that depends on a

finding of dangerousness, it is not necessary where the law at issue is a

categorical ban like § 922(g)(5)(A).

The historical record before the Court shows that an individual would

have been disarmed for having not sworn an oath of allegiance regardless of

their individual circumstances. As another judge in this Circuit recently

explained, "[t]he colonial bans for refusal to swear an oath of allegiance were

categorical bans that did not distinguish between individualized

circumstances any more than does § 922(g)(5)(A)'s requirement that the

individual be 'illegally or unlawfully present.'" *United States v. Duque-*

*Ramirez*, 2024 WL 4508582, at \*6 (W.D. Okla. Oct. 16, 2024). Zamora-

Hernandez cites no authority to support his as-applied challenge, and I am

17

not convinced that an individualized assessment is warranted under the Supreme Court's Second Amendment jurisprudence, at least for categorical bans like § 922(g)(5)(A). *See id.* at n.7.

I will join the weight of authority finding § 922(g)(5)(A) constitutional in the context of both facial and as-applied challenges. *See Duque-Ramirez*, 2024 WL 4508582, at *7 n.8 (collecting cases). Disarming unlawful immigrants like Zamora-Hernandez who have not sworn allegiance to the United States comports with this Nation's history and tradition of firearm regulations. "The swearing of an oath of allegiance occurs through the naturalization process, not through … years of living in the United States." *United States v. Serrano-Restrepo*, No. 2:24-cr-107, 2024 WL 4852233, at *8 (S.D. Ohio Nov. 21, 2024). Therefore, Zamora-Hernandez's as-applied challenge lacks merit and § 922(g)(5)(A) is constitutional as applied to him.

## C. Conclusion

For the reasons described above, the Court finds § 922(g)(5)(A) is a constitutional exercise of congressional authority. This Nation's historical tradition of firearm regulation at the time the Second Amendment was adopted includes laws that are sufficiently analogous to the contemporary disarmament of noncitizens like Zamora-Hernandez. Therefore, his motion to dismiss [ECF No. 29] is denied.

IT IS THEREFORE ORDERED that Defendant's "Motion to Dismiss

Indictment as Unconstitutional" [ECF No. 29] is DENIED.

DATED this 13th day of February, 2025.

_____
Sara E. Hill
UNITED STATES DISTRICT JUDGE